## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CLAUDIA I. TORRES

    Plaintiff,

          v.

HILTON INTERNATIONAL OF
PUERTO RICO, INC

    Defendant.

**Civil No. 10-1190 (SEC)**

## OPINION AND ORDER

Before the Court are defendant's motion for summary judgment (Docket # 23), plaintiff's opposition thereto (Docket # 27), and the parties' respective reply memoranda (Dockets # 49 and 56). After reviewing the filings and the applicable law, defendant's motion is **DENIED**.

### Factual and Procedural Background

Plaintiff Claudia I. Torres filed this suit against her former employer Hilton International of Puerto Rico, Inc. ("Defendant"), pursuant to the Americans with Disabilities Act ("ADA")[1] and to the laws of Puerto Rico. Docket # 1. Torres claims that Defendant terminated her employment after learning of her mental disability through a request of reasonable accommodation. With preliminary procedural nuances out of the way, Defendant moved for summary judgment, and Torres opposed. The uncontested, material facts relevant at this juncture follow.

Defendant owns and operates the Caribe Hilton Hotel located in San Juan, Puerto Rico. It employs over 500 people. Docket # 28-1, p. 19, ¶ 1. Torres began working there on February 23, 2001 as a Food & Beverage Attendant in the Room Service Department. Docket # 23-1, ¶ 3. She was affiliated to the Gastronomical Workers' Union, and a collective

---

[1] 42 U.S.C. § 12101 *et seq.*

bargaining agreement ("CBA") governed her employment relationship with Defendant. Id.,
¶¶ 5 and 6. Under the CBA, barring exceptional circumstances, Defendant was required to
abide by a seniority system when making employee-related decisions such as shift
assignments, days off, and vacations. Id., ¶ 7. The CBA, however, nowhere established how
Defendant was to handle reasonable accommodation requests nor stated that those requests
had to be denied when contrary to the seniority system in place.  Docket # 28-1, p. 31, ¶¶ 40-
41. At any rate, Defendant had to consider seniority when establishing Torres' regular work
shifts within the Food & Beverage Department.  Docket # 23-1, ¶ 8.

Torres' performance at work was satisfactory at the beginning. Thus, in 2006,
Defendant awarded her with a certificate for "her commitment and dedication during the last
5 years of service." Docket 28-1, p. 20, ¶ 2. Things took a turn for the worse thereafter,
however.

In March of 2007, Torres received a written coaching and counseling memo due to
eleven instances of tardiness and one unannounced absence. Docket # 23-1, ¶ 33. A three-day
suspension from work and pay followed five months later—Torres had been seen in the
employee parking lot stumbling around (apparently drunk), and she had fallen asleep in her
car without reporting to her shift. Id., ¶ 34. She showed up drunk to work again early in 2008,
and Defendant reprimanded her with a written warning. Id., ¶ 36. Another written warning
ensued seven days later, this one due to four instances of tardiness during the two preceding
weeks. Id., ¶¶ 37, 38. Then, in the summer of 2008, Torres was suspended from work and
pay (five days) for a second time—she had "finished her work shift but [had] remained at the
Hotel's premises . . . at a different department than hers, consuming a juice without the
required authorization." Id., ¶ 39.

Torres' health deteriorated two weeks thereafter. She was hospitalized at a psychiatric
facility for seven days, and weeks later, went back in for a 16-day "Out-Patient Partial
Hospitalization Program." Docket # 28-1, p. 25, ¶¶ 16-17. But because Torres properly

documented her hospitalization with Defendant, she was welcomed back to work when cleared by the doctor. Docket # 23-1, ¶ 41. Notwithstanding, on August 25, 2008, Defendant again suspended Torres from work and pay (five days) due to a "No Show-No Call," (id., ¶ 40), and her mental condition worsened to the point that she had to be hospitalized for psychiatric reasons on September 1, 2008 (Docket # 28-1, p. 26, ¶ 20).

Torres was released from the hospital on October 1, 2008. Docket # Id., p. 24, ¶ 24. And a week later, she visited Defendant's Human Resources Department accompanied by her mother. Id., ¶ 25. During the visit, Torres informed Defendant that she had been diagnosed with bipolar disorder and was receiving psychiatric treatment; that she wanted to return to work once cleared by the psychiatrist; and that she was interested in a transfer to another department within Food & Beverage because there was too much gossip where she worked. Id., ¶¶ 44 and 48.

Defendant denied Torres' transfer request out of hand. Its representatives told her that there was no opening available, and that if one came about, she would have to defer to any employee with seniority over her. Id., ¶ 51. Defendant's representatives also explained to Torres that

> the assignment of [Food and Beverage] Attendants in different departments of the Hotel responded to a system set up by the Union and established in the Collective Bargaining Agreement executed between the Union and the Hotel in which employees were assigned to different work areas based on their seniority. [That] . . . the work schedules in the Hotel were based on the employee's seniority and that employees with more seniority choose whatever outlets they preferred to work in.

Id., ¶ 50. All the same, the meeting concluded with neither an agreement on a possible accommodation for Torres nor on a date for her return to work.[2]

Defendant next addressed Torres on November 5, 2008, when it issued a termination

---

[2] During the meeting, Torres denied an offer to request leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615. Docket # 23-1, ¶ 46. But other than that, the parties' submissions contain nothing about what was said about a specific date for Torres' return to work.

letter bearing her name. Docket 23-1, ¶ 53.[3]  The letter, however, never reached Torres. Docket # 28-1, p. 37, ¶ 63. So seven days later, when she was cleared to work, Torres (psychiatrist's certificate in hand) immediately reported to Defendant intending to be scheduled back on her shift. Id. Defendant then provided her with a copy of the termination letter, and this suit eventually ensued. Id.

As stated above, Defendant timely moved for summary judgment. It advances a two-pronged argument: (1) that Torres was not a qualified individual under the ADA because of her record of absenteeism; and (2) that the accommodation she requested (transfer to another department) contravened the CBA's seniority system, and thus fell under the "undue hardship" exception to the reasonable accommodation requirement of the ADA. Plaintiff opposed each of these contentions.

### Standard of Review

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 569(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramirez-Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 77 (1st Cir. 2005).  In reaching such a determination, the Court may not weigh the evidence.  Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 684 (1st Cir. 1994).  At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The summary judgment inquiry is grounded in the factual evidence available, since

---

[3]  In Defendant's own words: "[a]s a result of Plaintiff's no show, no call, for more than a month, on November 5, 2008 Plaintiff was discharged." Id. Torres disputes Defendant's "no show, no call" contention. According to Torres, she visited with her supervisor a week before her termination, and he told her that she could return to work when cleared by the doctor. Docket # 28-1, p. 35, §§ 56-60. This factual controversy plays no role in the Court's ruling.

"[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact at issue that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (quoting Garside, 895 F.2d at 48). A material fact, in turn, is one that may affect the outcome of the suit under the governing law. Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 748 (1st Cir. 1994).

At any rate, to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). Accordingly, once the party moving for summary judgment has established an absence of material facts in dispute, and that judgment is proper as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion." Mendez-Laboy v. Abbott Lab., Inc., 424 F.3d 35, 37 (1st Cir. 2005) (quoting Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). "The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue . . . . Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence"); Medina-Muñoz, 896 F.2d at 8 (quoting

Mack v. Great Atl. & Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve").

### Applicable Law and Analysis

*The ADA Claims*

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The purpose of the ADA is to protect qualified individuals from disability-based employment discrimination. Id., § 12112(a). Accordingly, it encompasses all employment practices, including, but not limited to, job application procedures, hiring, firing, advancement, and compensation. Id.

To succeed under the ADA, in the absence of direct evidence of discrimination, a party must rely on the three-pronged burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, a plaintiff must first make a prima facie showing of disability discrimination by proving through a preponderance of the evidence that she was 1) disabled within the meaning of the Act; 2) able to perform the essential functions of her job, with or without reasonable accommodation; and 3) discharged or adversely affected, in whole or in part, because of her disability. Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005). If the plaintiff satisfies the first prong of the framework, the burden then shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for its employment decision and produce credible evidence to show that the reason advanced was the real reason. Freadman v. Metropolitan Property and Cas. Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007).

Once defendant offers a legitimate non-discriminatory reason, the initial inference of discrimination evaporates, and the burden then shifts back to the plaintiff. At this stage, the plaintiff must advance evidence to establish that defendant's non-discriminatory justification

is a mere pretext cloaking discriminatory animus. Freadman, 484 F.3d at 99. In other words, "the plaintiff must muster proof that enables a fact finder to rationally conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination." Laurin v. Providence Hosp.,150 F.3d 52, 58 (1st Cir. 1998).

In this case, Defendant premises its challenge to Torres' ADA claims on the first prong of the McDonnell Douglas burden shifting framework. It first contends that Torres' record of absenteeism suffices to show that she was unable to perform the essential functions of her job, with or without reasonable accommodation.[4] As stated above, performance of the essential functions of the job is a sine qua non for a successful ADA claim. Attendance is, of course, an essential function of any job. Rios-Jimenez v. Principi, 520 F.3d 31, 42 (1st Cir. 2008). "Gross attendance problems can [therefore] prevent a disabled person from being qualified for a position even when the attendance problem is related in whole or in part to the disability." Castro-Medina v. Procter & Gamble Commercial Co., 565 F.Supp. 2d 343, 369 (D.P.R. 2008). Indeed, the law is uncontested in this regard: an employee who frequently misses work, valid excuse or not, is not a qualified individual able to perform the essential functions of her job, either with or without reasonable accommodation. See e.g. Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 33-34 (1 Cir. 2011); Rios-Jimenez, 520 F.3d at 42; Jackson v. Veterans Admin., 22 F.3d 277, 277-79 (11th Cir. 1994); Tyndall v. National Educ. Ctrs., Inc. of California, 31 F.3d 209, 213 (4th Cir. 1994); Castro-Medina, 565 F.Supp. 2d at 369; Walders v. Garrett, 765 F.Supp. 303, 309 (E.D. Va. 1991).

---

[4] Defendant neither contests that Torres was disabled for ADA purposes nor refutes that her termination constituted an adverse employment action. Moreover, despite Torres' less than stellar personnel record, Defendant presents no argument under the second prong of the burden shifting framework. The stated reason for Torres' termination was "job abandonment." Docket 23-1, ¶ 53. Accordingly, at this stage, Torres' allegation that she visited with her supervisor days before her termination, and that he told her then that she could return to work when cleared by the doctor, would have weighed heavily against a ruling for Defendant on such prong of the framework.

Defendant clings to the foregoing case law and presents the Court with an exhaustive recount of Torres' personnel record, underscoring each and every one of her absences. Defendant's position, however, is problematic for at least three reasons. First, it is undisputed that Torres never obtained reasonable accommodation in connection with her bipolar disorder diagnosis. It follows then that even though the uncontested evidence of record shows that Torres frequently missed work prior to her termination, the record lacks evidence to support the conclusion that Torres' attendance issues would have continued had she received reasonable accommodation. Courts faced with similar scenarios have generally denied summary judgment. See e.g. Taylor v. Phoenixville School Dist., 184 F.3d 296, 218 (1999) ("When the disability involved is one that is heavily stigmatized in our society—as is true when the employee is voluntarily or involuntarily committed to a mental institution—courts should be especially wary on summary judgment of underestimating how well an employee might perform with accommodations . . . ."). Torres underscores this point in her submissions to the Court, but Defendant nowhere addresses it.

Second, Defendant's position runs contrary to many of the cases it relies upon, where plaintiffs were terminated because, among other reasons, they received reasonable accommodation but still failed to correct absenteeism problems. See Colon-Fontanez, 660 F3d at 35 ("The record, both pre-dating and post-dating her [reasonable accommodation], ma[de] overwhelmingly clear that [she] could not satisfy regular attendance requirements."); Rios-Jimenez, 520 F.3d at 42 (noting that plaintiff "had a spotty attendance record even after she was permitted to work part-time as recommended by her psychiatrists"); Castro-Medina, 565 F.Supp. 2d 343 (noting that plaintiff, who had been absent from work for 878 days during a span of three years and seven months, conceded that defendant "allowed her to take numerous leaves of absences for the diagnosis and treatment of her medical conditions"); Tyndall., 31 F.3d at 214 (finding that defendant's "extensive accommodations of [plaintiff's] lupus condition did not improve her attendance level"); Walders, 765 F.Supp at 309 ("[D]uring the course of her tenure [defendant] provided plaintiff with various combinations

of leave and restrictions, none of which proved effective."). Defendant nowhere acknowledges this discrepancy, which significantly weakens the position it advances.

Last but not least, the record before the Court shows that Defendant tolerated Torres' absenteeism through the years. To be sure, Defendant did reprimand Torres for unauthorized absences. But it was not until Torres notified Defendant that she had been diagnosed with bipolar disorder, that Defendant terminated her employment. Such a temporal proximity between a reasonable accommodation request and an adverse employment action generally raises a red flag that can preclude summary judgment. See D.B. ex el rel. Elizabeth B. v. Esposito, 675 F.3d 26, 42 (1st Cir. 2012). At any rate, the stated reason for Torres' termination was "job abandonment" rather than her previous absenteeism problems, so the Court takes Defendant's focus on Torres' absences with caution and ponders whether it may constitute an improper, after-the-fact attempt at window dressing. None of Defendant's submissions at this stage has foreclosed this possibility; accordingly, Defendant's overemphasis on Torres' absenteeism misses the mark.

Defendant's fallback position also falters. As previously mentioned, Defendant also contends that the accommodation Torres requested (transfer to another department) contravened the CBA's seniority system, and thus fell under the "undue hardship" exception to the reasonable accommodation requirement of the ADA. Defendant premises this argument on a line of cases standing for the general principle that accommodations that contravene the rules of a seniority system are not reasonable for ADA purposes. See e.g. U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 403-05 (2002). Defendant, however, has failed to put the Court in a position to apply those cases to the undisputed facts brought forth at this stage.

For example, although it is an undisputed fact of record that the CBA contained a clause exempting enforcement of the seniority system under exceptional circumstances (Docket # 23-1, ¶ 7), the record is devoid of evidence to conclude that Torres' circumstances fell outside the scope of such clause. Similarly, Defendant failed to introduce evidence to account for the undisputed fact that the CBA nowhere established how Defendant was to

handle reasonable accommodation requests nor stated that those requests had to be denied when contrary to the general provisions of the seniority system. Docket # 28-1, p. 31, ¶¶ 40-41. The Court therefore cannot credit Defendant's contention that Torres' transfer request ran contrary to the CBA's seniority system. Indeed, a jury presented with the facts just described may arrive at the opposite conclusion.

Still, Defendant's contentions on this front fail for yet another reason. The ADA requires covered employers to engage in an informal, interactive process with a qualified employee once appraised of the need for reasonable accommodation. 29 C.F.R. § 1630.2(o)(3). This process calls for the employer to engage the employee in a meaningful dialogue to "identify the precise limitations resulting from the disability and the potential reasonable accommodation that could overcome those limitations." Id.; see also Tobin, 433 F.3d at 108. The rationale behind this process is both sound and simple:

> The process must be interactive because each party holds information the other does not have or cannot easily obtain. . . . [The] employer will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities, especially in a large company.

Taylor, 184 F.3d at 316. Accordingly, an employer's failure to engage in the interactive process may, on itself, "constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA." Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996).

Here, Defendant posits that it engaged in the requisite interactive process when it explained to Torres that a transfer was not an alternative due to the CBA's seniority system. Docket # 49, p. 8. Two obvious flaws fatally afflict this argument. First, the Court already established that the record does not support the conclusion that the CBA's seniority system prohibited Torres' transfer request. Second, an employer's duty under the interactive process goes far beyond articulating a feasible explanation to reject an employee's suggested accommodation. See Taylor, 184 F.3d at 315-16 ("The interactive process would have little

11

meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome."). In fact, a qualified employee need not come forward with a reasonable accommodation proposal of her own. It is the employers' burden to "take steps to understand and address their employee's disabilities," Tobin, 433 F.3d at 108 n. 7, as they "will often hold more information than the employee about what adjustments are feasible in the employee's current position." Taylor, 184 F.3d at 316.

Furthermore, Torres' opposition memoranda provides valid examples of the kind of steps a jury could determine were available for Defendant to discharge its duties under the interactive process: 1) Defendant could have asked her for information about her bipolar disorder diagnosis; 2) Defendant could have consulted with her doctor about needed accommodations; 3) Defendant could have referred her to a professional counselor or established a so-called Employee Assistance Plan (both alternatives provided for under Defendant's internal policies); or 4) Defendant could have helped her contact external resources to address her disability. Docket # 27, pgs. 20-21. Moreover, the Court notes that Defendant, at the very least, could have summoned Torres' Union representative to explore viable accommodation alternatives under the CBA. The record presented to the Court shows that Defendant took none of these actions, which suffices to deny the pending motion. See Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998) ("[i]n a case involving an employee with mental illness, the communication process becomes more difficult, and [i]t is crucial that the employer [is] aware of the difficulties, and help the other party determine what specific accommodations are necessary") (quotation marks and citations omitted; alterations in original). But even worse, the record seems to reflect that Defendant rejected Torres' reasonable accommodation request out of hand, with no significant interaction whatsoever regarding possible alternatives to address her situation. The Court is aware of no authority warranting summary judgment under such scenario, and Defendant has certainly come

forward with none; the reason, perhaps, being that binding precedent directs otherwise. See Katz v. City Metal Co., Inc., 87 F.3d 26, 33 (1st Cir. 1996) (reversing summary judgment where accommodations sought were "rejected out of hand" and stating that "[w]ith respect to known disabilities . . . the emphasis is on encouraging the employer to 'engage in an interactive process with the individual to determine an effective reasonable accommodation'").

Defendant makes much of the fact that Torres expressly declined an invitation to complete the necessary forms to request leave under the FMLA. Docket # 23-3, p. 19. But in so arguing, Defendant disregards that leave under the FMLA does not constitute reasonable accommodation, but rather, a right provided under a completely different statutory scheme. See Navarro v. Pfizer Corp., 261 F.3d 90, 101 (1st Cir. 2001). And the proposition that an employer's duty to engage in an interactive process under the ADA may be discharged by presenting an employee with rights she already enjoys is nothing less than counterintuitive, to say the least.

Defendant similarly faults Torres for providing a poor explanation for the requested accommodation. According to Defendant, Torres' proffered reason for the transfer—that there was too much gossip in the Room Service Department—"was not a reasonable accommodation as a matter of law because it was not an accommodation at all as that term ought to be understood." Docket # 23-3, p. 20. Nevertheless, "[w]hat matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." Taylor, 184 F.3d at 313. The record here shows that Defendant knew about both Torres' disability and her desire to obtain reasonable accommodation. Therefore, that the reason proffered for the requested accommodation was less than clear is of no consequence. Id.; see also Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1286 (7th Cir. 1996) ("[P]roperly participating in the interactive process means that

an employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want reasonable accommodation,' particularly when the employee has a mental illness.").

To boot, Defendant's fallback contention fails for two reasons: first, its factual premise—that the CBA's seniority system prohibited Torres' transfer—is unsupported by the undisputed evidence of record; and second, whether Defendant complied with the requisite interactive process is disputed. Indeed, on the record presented to the Court here, a jury may very well find for Torres on both of these issues.

*Supplemental Law Claims*

Because Defendant's plea for the dismissal of Torres' state-law claims assumes the dismissal of her federal-law claims, the Court need not address the same.

**Conclusion**

For the forgoing reasons, Defendant's summary judgment motion is **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of July, 2012.

s/ *Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge